UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

_____

JOHN JOSEPH SCHULICK,

                 Plaintiff,              Case No. 2:11-cv-73

v.                               Honorable Robert Holmes Bell

MICHIGAN DEPARTMENT OF
CORRECTIONS et al.,

                 Defendants.
_____/

## OPINION

      This is a civil rights action brought by a state prisoner pursuant to 42 U.S.C. § 1983. The Court has granted Plaintiff leave to proceed *in forma pauperis*. Under the Prison Litigation Reform Act, PUB. L. NO. 104-134, 110 STAT. 1321 (1996), the Court is required to dismiss any prisoner action brought under federal law if the complaint is frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant immune from such relief. 28 U.S.C. §§ 1915(e)(2), 1915A; 42 U.S.C. § 1997e(c). The Court must read Plaintiff's *pro se* complaint indulgently, *see Haines v. Kerner*, 404 U.S. 519, 520 (1972), and accept Plaintiff's allegations as true, unless they are clearly irrational or wholly incredible. *Denton v. Hernandez*, 504 U.S. 25, 33 (1992). Applying these standards, the Court will dismiss Plaintiff's complaint for failure to state a claim against Defendants MDOC, PHS, Caruso, Boynton, McQuiggin, McDonald, Casey, Maclaren, Nadeau, McLean, Hagelee, McLeod, Storey, LaPlaunt, Durant, Batho, and Derry. The Court will serve Plaintiff's Eighth Amendment and retaliation claims against Defendants Vert,

Desrochers, Walski, Theel, Threlfall, Escherich, Watson, Richardson, Lieutenant John Doe, Brown, Nurse Jane Doe, Neri and Eicher.

### **Factual Allegations**

Plaintiff is incarcerated in the Alger Maximum Correctional Facility. In his *pro se* complaint, he sues the Michigan Department of Corrections (MDOC), Prisoner Health Services, Inc., MDOC Director Patricia Caruso and the following Alger employees: Wardens John Boynton and Greg McQuiggin; Inspectors (unknown) McDonald and (unknown) Casey; Assistant Deputy Warden (unknown) Maclaren; Assistant Deputy Warden of Housing Jackie Nadeau; Grievance Coordinator (unknown) McLean; Assistant Resident Unit Supervisor (unknown) Haglee; Sergeants (unknown) Vert and Richard Desrochers; Resident Unit Officer (unknown) Theel; Corrections Officers (unknown) Walski, Harold Threlfall, Richard Escherich, David Watson, James Richardson and (unknown) McLeod; Nurses Michelle Brown and Dawn Eicher; Nurse Supervisor Melissa LaPlaunt; Dr. Jesus Neri; Warden's Administrative Assistant Dawn Eicher; Hearings Investigator (unknown) Durant; and Assistant Resident Unit Supervisors (unknown) Batho and (unknown) Derry. In addition, Plaintiff sues two unknown parties named "Third Shift Unknown Lieutenant John Doe" and "Unknown Female RN Jane Doe."

Plaintiff's 88-page complaint, along with approximately 400 pages of exhibits and affidavits, arises from an alleged assault by prison staff that occurred at the Alger Maximum Correctional Facility on November 28, 2009. The following facts are taken from Plaintiff's complaint, exhibits and affidavits. On November 14, 2009, at approximately 1:00 a.m., Plaintiff left the restroom in Delta Unit and passed through the lobby where Defendant Officers Walski and Theel were reading "personal paperback books." (Compl., ¶ 37, Page ID#32.) Plaintiff accused the

- 2 -

officers of violating employee rules and asked how they could be vigilant and alert in their duties if they were distracted by books. The officers told Plaintiff to mind his own business and Officer Walski threatened, "We can make your bit very difficult." (Compl. ¶ 37, Page ID#33.) Later that evening when Officers Walski and Theel arrived in Delta Unit for third shift duty, they found a crude pornographic drawing of what appeared to be Officer Theel posted in the back lobby area of the unit. Officer Theel took down the drawing and contacted the shift supervisor, Lieutenant John Doe. Lieutenant John Doe, Theel and Walski went into Defendant ARUS Haglee's office for a meeting. When Theel emerged from Haglee's office, she announced in a loud voice, "Every one of you people who receive tickets tonight have Mr. Shulick to thank for it." (Compl., ¶ 39, Page ID#34.) Plaintiff denies that he created the pornographic rendering of Theel and claims that he never was questioned about the drawing by prison officials.

The following day, Plaintiff filed two grievances against Defendants Walski and Theel. In one grievance, Plaintiff complained that Walski and Theel violated employee rules by reading books while on duty and threatening to make Plaintiff's incarceration difficult. (*See* URF-09-11-3415-28x, Exhibit B-1, Page ID#217.) In the other grievance, Plaintiff claimed that Theel created a hostile environment for Plaintiff by blaming him for the issuance of misconduct tickets. (*See* URF-09-11-3413-28x, Exhibit B-1, Page ID#222.) According to Plaintiff, the first grievance was improperly rejected by the Grievance Coordinator, Defendant McLean, thus preventing him from exhausting his available administrative remedies against Defendants Walski and Theel. Defendant Sergeant Vert reviewed the second misconduct with Plaintiff on November 18, 2009. Plaintiff explained to Vert that he was concerned about Walski and Theel being distracted by books

because prisoners were making and passing knives through the unit "right under Officer Theel and Walski's unsuspecting, detracted [sic] noses." (Compl., ¶ 43, Page ID#38.)

On November 25, 2009, Plaintiff gave a statement at a misconduct hearing on behalf of another prisoner, Brian Warne. Later that evening Warne told Plaintiff to "watch his back" because Theel was very angry that Warne had successfully defended against the misconduct charge and would blame Plaintiff for his supporting testimony. (Compl., ¶ 45, Page ID#45.)

On November 28, 2009, Plaintiff went to bed at approximately 11:30 p.m. Plaintiff claims that about an hour later, he suddenly was awakened by several individuals dragging him from his bed and pushing him to the tile floor. As Plaintiff lay face-down on the floor, one of the individuals ordered him to stop resisting and place his hands behind his back. When Plaintiff realized that the individuals were custody staff, not other prisoners, he attempted to comply with the order. Plaintiff alleges that the "movement team" involved in the incident included Defendants Desrochers, Escherich, Threlfall, Watson and Richardson, who was operating a video camera. Plaintiff claims that he was unable to comply with the order due to the force being used by the officers to pull his arms, so the officers twisted his arms behind his back and placed him in handcuffs. As Plaintiff lay handcuffed on the floor, Defendants Threlfall and Watson began to kick and stomp Plaintiff's lower extremities. Plaintiff alleges that Defendants Desrochers, Escherich and Richardson failed to intervene to protect him from Threlfall and Watson. When the kicking and stomping ceased, one of the movement team members jumped on Plaintiff with his full weight and put his knee into Plaintiff's back. A movement team member jumped on Plaintiff's back a second time and jammed a cylindrical metal object into the back of Plaintiff's neck, which caused him severe pain. When Plaintiff attempted to turn over, he was kicked again.

- 4 -

Plaintiff contends that he never resisted or struck any of the officers during the incident. Defendant Threlfall informed Plaintiff that they came to move him to another unit, but did not respond when Plaintiff asked why he was being moved in the middle of the night. Plaintiff's feet were shackled by another movement team member. Plaintiff was ordered to stand, but was unable to do so as a result of the injuries that he had sustained to his left leg, buttocks and groin area during the assault. Plaintiff, who remained handcuffed and shackled, was taken in a wheelchair to health services. Plaintiff believes that Lieutenant John Doe was the one who authorized the movement team.

According to a critical incident report written by Defendant Watson, Defendant Desrochers made repeated loud orders for Plaintiff to move to another housing unit, but Plaintiff ignored the orders and pretended to be asleep. (Critical Incident Report, Exhibit A-1, Page ID#98.) When Desrochers shook Plaintiff's bunk, he allegedly responded with exaggerated snoring noises. The movement team was assembled and Officer Richardson was given a video camera to record the incident. After Plaintiff ignored additional direct orders to get out of his bunk, the team attempted to apply restraints. Officer Threlfall was told to control Plaintiff's upper body, Officer Watson was told to control his legs and Officer Escherich was told to apply the restraints. The critical incident report states that Plaintiff resisted the officers and struck Defendant Threlfall in the chest before being restrained. The report further stated that due to a problem with the video camera, Defendant Richardson did not begin to record the incident until Plaintiff was taken to health services.

Plaintiff alleges that when he arrived in health services, he was examined by Defendant Nurse Brown. Plaintiff told Brown that he thought his leg was broken. He also informed Brown that he suffered from a chronic blood disease known as Thrombocytosis/ Myeloproliferative

disorder.  Brown told Plaintiff that there was nothing wrong with his leg and that his blood disease was not relevant to his complaint, and told him to leave.

Plaintiff was taken from health services to the segregation unit, where he was left on the floor of the unit's intake cage.  As Plaintiff lay on the floor in excruciating plain from his injuries, an unknown officer dragged him backward across the floor by his manacled wrists to the front of the cage.  Plaintiff alleges that he lost consciousness as result of the intense pain.  When Plaintiff awoke the following morning, he was ordered to strip for a search.  As he removed his clothing, Plaintiff noticed that he had urinated on himself during the night.  Plaintiff claims that he lay naked on the floor of the intake cage for twenty minutes calling for a doctor before Nurse Jane Doe came to examine his injuries.  Nurse Jane Doe told Plaintiff the swelling in his leg was minimal and "if Brown told him there is nothing wrong with it, then there's nothing wrong with it." (Compl., Page ID#49.)  Plaintiff was given clothing and ordered to walk to his cell.  Plaintiff claims that he could not comply with the order because he was physically incapable of standing or walking.  Because Plaintiff did not comply with the order, Officer Ortiz issued a major misconduct for disobeying a direct order.  Earlier that night, Plaintiff also had received a major misconduct ticket from Defendant McLeod for failing to comply with his order to "stand and strip."  When Plaintiff did not comply with Ortiz's order, Officer Smith said to Plaintiff, "If you don't stand up and walk to cell S-110 right now, I'm going to drag you all the way down there by your bad leg!" (Compl., Page ID#50.) However, Officers Ortiz and Smith ultimately took Plaintiff to his cell in a wheelchair.

Plaintiff claims that despite his repeated cries for medical assistance, he did not receive any further attention from medical staff for three days.   Plaintiff was in such severe pain during that time that he was unable to eat or drink.  On December 1, 2009, Dr. Jesus Neri examined

Plaintiff's leg, which was extremely swollen and discolored.  Plaintiff told Dr. Neri that he was in excruciating pain and asked to be taken to the local hospital emergency room.  Plaintiff also asked to the see Dr. Bolmer, the specialist who treated his Thrombocytosis.  Dr. Neri gave Plaintiff some Ultram, a hot water bottle and crutches.  The doctor also advised Plaintiff to eat and dismissed him. Dr. Neri examined Plaintiff's leg again two days later, on December 3, but did not provide any further treatment.  On December 4, Plaintiff began experiencing severe chest pains and Dr. Stallman authorized his transfer to War Memorial Hospital.  The emergency room doctor, Dr. Ranta, ordered an ultrasound of Plaintiff's left leg, which revealed a blood clot.  Dr. Ranta also ordered morphine to ease Plaintiff's pain.  Plaintiff was released from the hospital on December 5 or 6 and returned to the segregation unit at Alger.

On December 9, 2009, Plaintiff was taken to the nurse's station within the segregation unit where Defendant Nurse Eicher informed Plaintiff that Dr. Ranta had advised the medical service provider about the blood clot in Plaintiff leg.  Plaintiff was placed on Lovinox injections and an oral Coumadin regimen to treat the clot.  Plaintiff was given only regular strength Tylenol, which did nothing to ease his severe leg pain.  Plaintiff ultimately was sent for an off-site appointment with Dr. Bolmer several months later on May 6, 2010.  Plaintiff claims that he continues to suffer from pain and numbness in his left leg.  He also suffers from emotional distress resulting from the brutal assault perpetrated by members of the movement team.  In addition, Plaintiff asserts that he "continues to experience the psychologically 'chilling effects' of the herein named and/or described Defendants/Conspirators definitive, longstanding, widespread policy, custom and usage practice of de facto deliberate indifference/intimidation/retaliation so pervasively enforced by the governmental entity and its agents/employees as to have the force of law."  (Compl., 51, Page ID#59.)

- 7 -

Plaintiff claims that during the 45-day period that he was in administrative segregation, he repeatedly kited Defendant Investigators McDonald and Casey and Defendants Batho and Derry asking for information from his legal footlocker so that he could file the Step II appeal for Grievance No. URF 09-11-3415-28Z, but he received no response.  As a result, his Step II grievance appeal was rejected as untimely.  Plaintiff contends that Defendants McDonald, Casey, Batho and Derry conspired to prevent him from exhausting his administrative remedies in violation of his right of access to the courts.  Plaintiff further alleges that Defendants "conspired to retaliate against the prisoner for exercising his United States Constitutional First Amendment right to grieve alleged violations of policy or procedure, or unsatisfactory conditions of confinement that directly affects [sic] his health and/or safety." (Compl., Page ID#63.)

While he was in administrative segregation, Plaintiff also kited Defendant Wardens Boynton and McQuiggin to inform them that his reading glasses had been lost or stolen under the direct care and supervision of Defendant Theel.  Plaintiff claims that his kites were not answered in a timely manner.  After Plaintiff was released from segregation on January 11, 2010, he discovered that certain legal property relating to a pending civil rights action had been confiscated.  Plaintiff again kited Defendants Boynton and McQuiggin, but received no response.  Plaintiff contends that Defendants Boynton and McQuiggin, along with Defendants McDonald, Casey, Maclaren, Nadeau and Caruso, failed to properly supervise their subordinate staff members and have instituted and maintained policies, customs or usages that resulted in the violation of Plaintiff's constitutional rights by prison staff.

Following a misconduct hearing on December 15, 2009, Plaintiff was found guilty of the disobeying-a-direct-order charge brought by Officer McLeod.  Plaintiff requested a hearing

packet from Defendant Durant in order to request a rehearing.  Plaintiff's request for rehearing was returned to him on January 15, 2010, because the hearing packet did not include the misconduct report.  Plaintiff was required to provide the complete rehearing packet within thirty days in order to continue with his appeal.  Plaintiff claims that he repeatedly kited Defendant Durant for a complete hearing packet, but received no response.  When Plaintiff filed a grievance regarding the matter on February 10, 2010, Durant claimed that he was unaware of Plaintiff's request and provided him with the complete hearing packet on February 16, 2010.  (Step I Grievance Response, No. URF-1002-0484-O7F, Exhibit B-17, Page  ID#326.)  Because more than thirty days had passed, Plaintiff claims that his appeal was dismissed.

Plaintiff brings six legal claims against Defendants.  In Count I, Plaintiff contends that Defendants Vert, Walski, Theel, Desroches, Escherich, Threlfall, Watson, Richardson and Lieutenant John Doe retaliated against him for filing grievances by assaulting him on November 28, 2009.  Plaintiff alleges in Count II that Defendants Desrochers, Escherich and Richardson violated his Eighth Amendment rights when they failed to protect him from assault by Defendants Threlfall and Watson.  In Count III of the complaint, Plaintiff alleges that all of the named Defendants "conspir[ed] to impede, stifle and/or thwart the Plaintiff's right to grieve unsatisfactory conditions of his confinement, combined with the 'unnecessary wanton infliction of pain without any penological justification,' in retaliation for the free exercise of a protected constitutional right, and further compounded by a willful, wanton, reckless disregard for the substantial risk of serious harm to the prisoner's health and safety."  (Compl. ¶ 89, Page ID#87.)  Plaintiff contends in Count IV that Defendants MDOC, PHS, Brown, Jane Doe, LaPlaunt, Eicher and Neri failed to provide him with proper medical treatment for the injuries sustained as a result of the assault in violation of the Eighth

Amendment.  Plaintiff further argues in Count V that Defendants Caruso and PHA failed to adequately train and supervise their employees, which "caused confederate adherence to a de facto policy, custom or usage practice of deliberate indifference/intimidation/retaliation so pervasive throughout the M.D.O.C. as to have force-of-law."  (Compl., ¶ 91, Page ID#90.)  Finally, in Count VI of the complaint, Plaintiff asks the Court to exercise supplemental jurisdiction over state law claims against Defendants for assault and battery.

Plaintiff seeks declaratory and injunctive relief, as well as an unspecified amount of monetary damages.

### Discussion

I.   Immunity

As an initial matter, Plaintiff may not maintain a § 1983 action against the MDOC. Regardless of the form of relief requested, the states and their departments are immune under the Eleventh Amendment from suit in the federal courts, unless the state has waived immunity or Congress has expressly abrogated Eleventh Amendment immunity by statute.  *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 98-101 (1984); *Alabama v. Pugh*, 438 U.S. 781, 782 (1978); *O'Hara v. Wigginton*, 24 F.3d 823, 826  (6th Cir. 1993).  Congress has not expressly abrogated Eleventh Amendment immunity by statute, *Quern v. Jordan*, 440 U.S. 332, 341 (1979), and the State of Michigan has not consented to civil rights suits in federal court.  *Abick v. Michigan*, 803 F.2d 874, 877 (6th Cir. 1986).  In numerous unpublished opinions, the Sixth Circuit has specifically held that the MDOC is absolutely immune from suit under the Eleventh Amendment. *See, e.g.*, *McCoy v. Michigan*, 369 F. App'x 646, 653-54 (6th Cir. Mar. 12, 2010); *Turnboe v. Stegall*, No. 00-1182, 2000 WL1679478, at *2 (6th Cir. Nov. 1, 2000).  In addition, the State of

- 10 -

Michigan (acting through the MDOC) is not a "person" who may be sued under § 1983 for money damages. *See Lapides v. Bd. of Regents*, 535 U.S. 613 (2002) (citing *Will v. Mich. Dep't of State Police*, 491 U.S. 58 (1989)). Therefore, the Court will dismiss the MDOC.

   II.   <u>Failure to state a claim</u>

   A complaint may be dismissed for failure to state a claim if "'it fails to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)). While a complaint need not contain detailed factual allegations, a plaintiff's allegations must include more than labels and conclusions. *Twombly*, 550 U.S. at 555; *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). The court must determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S. Ct. at 1949. Although the plausibility standard is not equivalent to a "'probability requirement,' . . . it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 129 S. Ct. at 1949 (quoting *Twombly*, 550 U.S. at 556). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – that the pleader is entitled to relief." *Iqbal*, 129 S. Ct. at 1950 (quoting FED. R. CIV. P. 8(a)(2)); *see also Hill v. Lappin*, 630 F.3d 468, 470-71 (6th Cir. 2010) (holding that the *Twombly/Iqbal* plausibility standard applies to dismissals of prisoner cases on initial review under 28 U.S.C. §§ 1915A(b)(1) and 1915(e)(2)(B)(i)).

- 11 -

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation of a right secured by the federal Constitution or laws and must show that the deprivation was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 814 (6th Cir. 1996). Because § 1983 is a method for vindicating federal rights, not a source of substantive rights itself, the first step in an action under § 1983 is to identify the specific constitutional right allegedly infringed. *Albright v. Oliver*, 510 U.S. 266, 271 (1994).

## A.  Eighth Amendment

### 1.  Excessive Use of Force

Plaintiff alleges in Count II that Defendants Desrochers, Escherich and Richardson violated his Eighth amendment rights when they failed to protect him from an unwarranted assault by Defendants Threlfall and Watson. At this stage of the proceedings, the Court finds that Plaintiff's allegations are sufficient to state an Eighth Amendment claim. In addition, reading Plaintiff's *pro se* complaint indulgently, *see Haines*, 404 U.S. at 520, Plaintiff also states an Eighth Amendment claim against Defendants Threlfall and Watson, who allegedly carried out the brutal attack. Accordingly, the Court will order service of Plaintiff's Eighth Amendment claim against Defendants Desrochers, Escherich, Richardson, Threlfall and Watson.

### 2.  Denial of Medical Care

Plaintiff contends in Count IV that Defendants MDOC, PHS, Brown, Jane Doe, LaPlaunt, Eicher and Neri violated his Eighth Amendment rights when they failed to provide him with proper medical treatment for the injuries sustained during the alleged assault. The Court concluded above that the MDOC is immune from suit under § 1983. The Court also finds that Plaintiff's allegations are insufficient to state a claim against Defendants PHS and LaPlaunt.

- 12 -

Plaintiff sues PHS for the conduct of its employees.  A plaintiff bringing an action pursuant to § 1983 cannot premise liability upon a theory of respondeat superior or vicarious liability.  *Iqbal*, 129 S. Ct. at 1948; *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 691(1978); *Everson v. Leis*, 556 F.3d 484, 495 (6th Cir. 2009).  A claimed constitutional violation must be based upon active unconstitutional behavior.  *Grinter v. Knight*, 532 F.3d 567, 575 (6th Cir. 2008); *Greene v. Barber*, 310 F.3d 889, 899 (6th Cir. 2002).  The acts of one's subordinates are not enough, nor can supervisory liability be based upon the mere failure to act.  *Grinter*, 532 F.3d at 575; *Greene*, 310 F.3d at 899; *Summers v. Leis*, 368 F.3d 881, 888 (6th Cir. 2004).  "[A] plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."  *Iqbal*, 129 S. Ct. at 1948.  Plaintiff has failed to allege that PHS engaged in any active unconstitutional behavior.  Because Plaintiff's claim against PHS is premised on nothing more than respondeat superior liability, his action fails to state a claim.

Plaintiff's allegations also are insufficient to state an Eighth Amendment claim against Defendant LaPlaunt, the nursing supervisor.  Plaintiff's only factual allegation against La Plaunt is that she failed to provide Plaintiff with the name of Nurse Jane Doe, who allegedly denied him medical treatment following the assault, so that Plaintiff could include her name in his grievance.  To the extent Plaintiff asserts an Eighth Amendment claim against LaPlaunt, she cannot be held liable for the conduct of a subordinate nurse under a theory of supervisory liability.  See *Iqbal*, 129 S. Ct. at 1948; *Monell,* 436 U.S. at 691; *Everson*, 556 F.3d at 495.  Plaintiff fails to allege

- 13 -

that Defendant LaPlaunt engaged in any active unconstitutional behavior with regard to his medical treatment; therefore, he fails to state an Eighth Amendment claim against her.[1]

Accordingly, the Court will dismiss Plaintiff's Eighth Amendment claims against PHS and LaPlaunt for failure to state a claim. At this stage of the proceedings the Court finds that Plaintiff's allegations are sufficient to state an Eighth Amendment claim against Defendants Brown, Nurse Jane Doe, Eicher and Neri.

### B.    Retaliation

In Count I, Plaintiff contends that Defendants Vert, Walski, Theel, Desrochers, Escherich, Threlfall, Watson, Richardson and Lieutenant John Doe retaliated against him for filing grievances against Walski and Theel by encouraging, authorizing or participating in the November 28, 2009 assault. At this stage of the proceedings, the Court finds that Plaintiff has made sufficient allegations to support service of his retaliation claim against Defendants Vert, Walski, Theel, Desrochers, Escherich, Threlfall, Watson, Richardson and Lieutenant John Doe.

### C.    Conspiracy to Impede Access to the Grievance Process

In Count III of his complaint, Plaintiff contends that Defendants conspired to deny him access to the administrative grievance process by rejecting and denying his grievances and grievance appeals. For example, Plaintiff alleges that during the 45-day period that he was in administrative segregation, he repeatedly kited Defendant Investigators McDonald and Casey and Defendant ARUSs Batho and Derry asking for information from his legal footlocker so that he could file the Step II appeal for Grievance No. URF 09-11-3415-28Z, but he received no response. As a

---

[1]To the extent Plaintiff contends that LaPlaunt interfered with his due process right to file a grievance or interfered with his right of access to the courts for failing to provide the name of the nurse for inclusion on his grievance, his claims are addressed in Part C, infra.

result, his Step II grievance appeal was rejected as untimely.  Plaintiff also contends that Defendants McDonald, Casey, Batho and Derry conspired to prevent him from exhausting his administrative remedies in violation of his right of access to the courts.  Plaintiff alleges that Defendants "conspired to retaliate against the prisoner for exercising his United States Constitutional First Amendment right to grieve alleged violations of policy or procedure, or unsatisfactory conditions of confinement that directly affects [sic] his health and/or safety." (Compl, Page ID#63.)  Plaintiff further alleges that all of the named Defendants "conspir[ed] to impede, stifle and/or thwart the Plaintiff's right to grieve unsatisfactory conditions of his confinement, combined with the 'unnecessary wanton infliction of pain without any penological justification,' in retaliation for the free exercise of a protected constitutional right, and further compounded by a willful, wanton, reckless disregard for the substantial risk of serious harm to the prisoner's health and safety.  (Compl., Page ID#87.)

To state a claim for conspiracy, a plaintiff must plead with particularity, as vague and conclusory allegations unsupported by material facts are insufficient. *Twombly*, 550 U.S. at 565 (recognizing that allegations of conspiracy must be supported by allegations of fact that support a "plausible suggestion of conspiracy," not merely a "possible" one); *Fieger v. Cox*, 524 F.3d 770, 776 (6th Cir. 2008); *Spadafore v. Gardner*, 330 F.3d 849, 854 (6th Cir. 2003); *Gutierrez v. Lynch*, 826 F.2d 1534, 1538 (6th Cir. 1987);  *Smith v. Rose*, 760 F.2d 102, 106 (6th Cir. 1985); *Pukyrys v. Olson*, No. 95-1778, 1996 WL 636140, at *1 (6th Cir. Oct. 30, 1996).  A plaintiff's allegations must show (1) the existence or execution of the claimed conspiracy, (2) overt acts relating to the promotion of the conspiracy, (3) a link between the alleged conspirators, and (4) an agreement by the conspirators to commit an act depriving plaintiff of a federal right.  *Lepley v. Dresser*, 681 F. Supp. 418, 422 (W.D. Mich. 1988).  "[V]ague allegations of a wide-ranging conspiracy are wholly conclusory and

- 15 -

are, therefore, insufficient to state a claim." *Hartsfield v. Mayer*, No. 95-1411, 1996 WL 43541, at *3 (6th Cir. Feb. 1, 1996).

Plaintiff's allegations of conspiracy are conclusory and speculative. His allegations, even viewed in the light most favorable to Plaintiff, describe a number of discrete facts that occurred over a period of time involving numerous prison employees. Plaintiff has provided no allegations establishing a link between the alleged conspirators or any agreement between them. As the Supreme Court has held, such allegations, while hinting at a "possibility" of conspiracy, do not contain "enough factual matter (taken as true) to suggest that an agreement was made." *Twombly*, 550 U.S. at 556. Instead, the Court has recognized that although parallel conduct may be consistent with an unlawful agreement, it is insufficient to state a claim where that conduct "was not only compatible with, but indeed was more likely explained by, lawful, unchoreographed . . . behavior." *Iqbal*, 129 S. Ct. at 1250. In light of the far more likely possibility that the various incidents complained of by Plaintiff were unrelated, Plaintiff fails to state a plausible claim of conspiracy.

To the extent Plaintiff contends that various Defendants impeded his access to the grievance process in violation of his due process rights, he fails to state a claim. Plaintiff has no due process right to file a prison grievance. The Sixth Circuit and other circuit courts have held that there is no constitutionally protected due process right to an effective prison grievance procedure. *Walker v. Mich. Dep't of Corr.,* 128 F. App'x 441, 445 (6th Cir. 2005); *Young v. Gundy,* 30 F. App'x 568, 569-70 (6th Cir. 2002); *Carpenter v. Wilkinson,* No. 99-3562, 2000 WL 190054, at *2 (6th Cir. Feb. 7, 2000); *see also Antonelli v. Sheahan*, 81 F.3d 1422, 1430 (7th Cir.1996); *Adams v. Rice*, 40 F.3d 72, 75 (4th Cir. 1994). Michigan law does not create a liberty interest in the grievance procedure. *See Olim v. Wakinekona,* 461 U.S. 238, 249 (1983); *Wynn v. Wolf*, No. 93-2411, 1994 WL 105907,

- 16 -

at *1 (6th Cir. Mar. 28, 1994). Because Plaintiff has no liberty interest in the grievance process, Defendants' conduct did not deprive him of due process. Plaintiff, therefore, fails to state a claim arising from the prison grievance process.

Likewise, Plaintiff cannot state a claim for denial of access to the courts arising from the grievance process. It is clearly established that prisoners have a constitutionally protected right of access to the courts under the First and Fourteenth Amendments. *See Lewis v. Casey*, 518 U.S. 343, 354 (1996); *Bounds v. Smith*, 430 U.S. 817, 821 (1977); *Wolff v. McDonnell*, 418 U.S. 539, 556 (1974). Prison officials have a two-fold duty to protect a prisoner's right of access to the courts. *McFarland v. Luttrell*, No. 94-6231, 1995 WL 150511, at *3 (6th Cir. Apr. 5, 1995). First, they must provide affirmative assistance in the preparation of legal papers in cases involving constitutional rights, in particular criminal and habeas corpus cases, as well as other civil rights actions relating to the prisoner's incarceration. *Id.* (*citing Bounds*, 430 U.S. at 824-28). Second, the right of access to the courts prohibits prison officials from erecting any barriers that may impede the inmate's accessibility to the courts. *Id.* (*citing Knop v. Johnson*, 977 F.2d 996, 1009 (6th Cir. 1992)). In order to state a viable claim for interference with his access to the courts, a plaintiff must show actual injury to pending or contemplated litigation. *See Lewis*, 518 U.S. at 349; *Dellis v. Corr. Corp. of Am.*, 257 F.3d 508, 511 (6th Cir. 2001); *Talley-Bey v. Knebl*, 168 F.3d 884, 886 (6th Cir. 1999); *Knop*, 977 F.2d at 1000.

Under 42 U.S.C. § 1997(a), a prisoner is required to exhaust "available" administrative remedies. The procedure becomes "unavailable" when prison officials have somehow thwarted the inmate's attempts at exhaustion. *Brock v. Kenton County, Ky.*, 93 F. App'x 793, 798 (6th Cir. 2004). Thus, if Defendants' alleged conduct prevented Plaintiff from filing or successfully

appealing his grievances, the grievance process was not available to him. Likewise, if Plaintiff could not obtain Nurse Jane Doe's name from Defendant LaPlaunt at the time he filed his grievance, the nurse's name was not "available" to him, and, thus, the exhaustion requirement is satisfied. Furthermore, Plaintiff was not prevented from filing this civil rights action and including Nurse Jane Doe as a Defendant. Plaintiff may seek Nurse Jane Doe's name through proper discovery. Because Plaintiff does allege or show that he suffered actual injury, he fails to state a claim.

Plaintiff also contends that Defendants rejected, denied and otherwise interfered with his access to the grievance process in retaliation for his filing of grievances. In order to set forth a First Amendment retaliation claim, a plaintiff must establish that: (1) he was engaged in protected conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from engaging in that conduct; and (3) the adverse action was motivated, in least in part, by the protected conduct. *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc). Moreover, Plaintiff must be able to prove that the exercise of the protected right was a substantial or motivating factor in the defendant's alleged retaliatory conduct. *See Smith v. Campbell*, 250 F.3d 1032, 1037 (6th Cir. 2001) (citing *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)).

Assuming that Plaintiff could satisfy the first two requirements for a retaliation claim, he cannot meet the third requirement. It is well recognized that "retaliation" is easy to allege and that it can seldom be demonstrated by direct evidence. *See Harbin-Bey v. Rutter*, 420 F.3d 571, 580 (6th Cir. 2005); *Murphy v. Lane*, 833 F.2d 106, 108 (7th Cir. 1987); *Vega v. DeRobertis*, 598 F. Supp. 501, 506 (C.D. Ill. 1984), *aff'd*, 774 F.2d 1167 (7th Cir. 1985). "[A]lleging merely the ultimate fact of retaliation is insufficient." *Murphy*, 833 F.2d at 108. "[C]onclusory allegations of

- 18 -

retaliatory motive 'unsupported by material facts will not be sufficient to state . . . a claim under § 1983.'" *Harbin-Bey*, 420 F.3d at 580 (quoting *Gutierrez v. Lynch*, 826 F.2d 1534, 1538-39 (6th Cir. 1987)); *see also Skinner v. Bolden*, 89 F. App'x 579, 579-80 (6th Cir. 2004) (without more, conclusory allegations of temporal proximity are not sufficient to show a retaliatory motive); *Birdo v. Lewis*, No. 95-5693, 1996 WL 132148, at *1 (6th Cir. Mar. 21, 1996); *Fields v. Powell*, No. 94-1674, 1995 WL 35628, at *2 (6th Cir. Jan. 30, 1995); *Williams v. Bates*, No. 93-2045, 1994 WL 677670, at *3 (6th Cir. Dec. 2, 1994).  Plaintiff merely alleges the ultimate fact of retaliation.  He has not presented any facts to support his conclusion that Defendants retaliated against him because he filed grievances.  *See  Iqbal*, 129 S. Ct. at 1949 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").  Accordingly, his speculative allegation fails to state a claim.

### D.    Supervisory Liability

Plaintiff alleges in Count V that Defendants Caruso and PHS failed to properly train or supervise their staff and have instituted and maintained policies, customs or usages that resulted in the violation of Plaintiff's constitutional rights by prison staff.  Plaintiff also sues Wardens Boynton and McQuiggin by virtue of their supervisory roles at URF and for their failure to act in response to his kites regarding the loss or theft of his reading glasses and the confiscation of a portion of his legal property.  In addition, Plaintiff sues Defendant Assistant Deputy Wardens Maclaren and Nadeau and ARUS Hagelee based upon their positions in the "decision-making chain" and failure to properly supervise their subordinates.  (Compl., 52.)

As previously discussed, government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of respondeat superior or vicarious

liability. *Iqbal*, 129 S. Ct. at 1948; *Monell*, 436 U.S. at 691; *Everson*, 556 F.3d at 495. The acts of one's subordinates are not enough, nor can supervisory liability be based upon the mere failure to act. *Grinter*, 532 F.3d at 575; *Greene*, 310 F.3d at 899; *Summers*, 368 F.3d at 888. Furthermore, a failure-to-train claim only can be properly directed against a municipality. *See Phillips v. Roane Cnty., Tenn.*, 534 F.3d 531, 543–44 (6th Cir. 2008). "Under § 1983, a municipality can only be held liable if the plaintiff demonstrates that the injury suffered was a direct result of the city's official policy or custom." *Slusher v. Carson*, 540 F.3d 449, 456-57 (6th Cir. 2008) (citing *Monell*, 436 U.S. at 694-95). None of the Defendants in this case is a municipality. Plaintiff has failed to allege that Defendants Caruso, PHS, Boynton, McQuiggin, Maclaren, Nadeau and Hagelee engaged in any active unconstitutional behavior. Accordingly, he fails to state a claim against them.

### E. Due Process

Plaintiff contends that Defendant Hearings Investigator Durant failed to timely provide him with a complete hearings packet for purposes of seeking a rehearing of his misconduct for disobeying a direct order, which resulted in the dismissal of Plaintiff's request for rehearing. A prisoner's ability to challenge a prison misconduct conviction depends on whether the convictions implicated any liberty interest. In the seminal case in this area, *Wolff v. McDonnell*, 418 U.S. 539 (1974), the Court prescribed certain minimal procedural safeguards that prison officials must follow before depriving a prisoner of good-time credits on account of alleged misbehavior. The *Wolff* Court did not create a free-floating right to process that attaches to all prison disciplinary proceedings; rather the right to process arises only when the prisoner faces a loss of liberty, in the form of a longer prison sentence caused by forfeiture of good-time credits:

> It is true that the Constitution itself does not guarantee good-time credit for satisfactory behavior while in prison. But here the State itself has not only provided a statutory right to good time but also specifies that it is to be forfeited only for

- 20 -

serious misbehavior.  Nebraska may have the authority to create, or not, a right to a shortened prison sentence through the accumulation of credits for good behavior, and it is true that the Due Process Clause does not require a hearing "in every conceivable case of government impairment of private interest."  But the State having created the right to good time and itself recognizing that its deprivation is a sanction authorized for major misconduct, the prisoner's interest has real substance and is sufficiently embraced within Fourteenth Amendment "liberty" to entitle him to those minimum procedures appropriate under the circumstances and required by the Due Process Clause to insure that the state-created right is not arbitrarily abrogated.

*Wolff*, 418 U.S. at 557 (citations omitted).

Plaintiff does not allege that his major misconduct conviction resulted in any loss of good-time credits, nor could he.  The Sixth Circuit has examined Michigan statutory law, as it relates to the creation and forfeiture of disciplinary credits[2] for prisoners convicted of crimes occurring after April 1, 1987.  In *Thomas v. Eby*, 481 F.3d 434 (6th Cir. 2007), the court determined that loss of disciplinary credits does not necessarily affect the duration of a prisoner's sentence.  Rather, it merely affects parole eligibility, which remains discretionary with the parole board.  481 F.3d at 440.  Building on this ruling, in *Nali v. Ekman*, 355 F. App'x 909 (6th Cir. 2009), the court held that a misconduct citation in the Michigan prison system does not affect a prisoner's constitutionally protected liberty interests, because it does not necessarily affect the length of confinement.  355 F. App'x at 912; *accord, Wilson v. Rapelje*, No. 09-13030, 2010 WL 5491196, at * 4 (E.D. Mich. Nov. 24, 2010) (Report & Recommendation) (holding that "plaintiff's disciplinary hearing and major misconduct sanction does not implicate the Fourteenth Amendment Due Process Clause"), *adopted as judgment of court*, 2011 WL 5491196 (Jan. 4, 2011).  In the absence of a demonstrated liberty interest, Plaintiff has no due-process claim based on the loss of disciplinary credits.  *See Bell v. Anderson*, 301 F. App'x 459, 461-62 (6th Cir. 2008).

---

[2] For crimes committed after April 1, 1987, Michigan prisoners earn "disciplinary credits" under a statute that abolished the former good-time system.  MICH. COMP. LAWS § 800.33(5).

Even in the absence of a protectible liberty interest in disciplinary credits, a prisoner may be able to raise a due-process challenge to prison misconduct convictions that result in a significant, atypical deprivation. *See Sandin v. Connor*, 515 U.S. 472 (1995). Unless a prison misconduct conviction results in an extension of the duration of a prisoner's sentence or some other atypical hardship, a due-process claim fails. *Ingram v. Jewell*, 94 F. App'x 271, 273 (6th Cir. 2004). Plaintiff does not have a protectible liberty interest in disciplinary credits and has not identified any significant deprivation arising from his misconduct conviction. Consequently, the dismissal of his request for rehearing does not implicate the Due Process Clause.

### F.   State Law Claim

In Count VI of the complaint, Plaintiff asks the Court to exercise supplemental jurisdiction over his state-law claim for assault and battery. Because the Court is serving Plaintiff's Eighth Amendment claim for excessive use of force, the Court will exercise supplemental jurisdiction over his related state-law claim for assault and battery.

### <u>Conclusion</u>

Having conducted the review now required by the Prison Litigation Reform Act, the Court determines that Defendants MDOC, PHS, Caruso, Boynton, McQuiggin, McDonald, Casey, Maclaren, Nadeau, McLean, Hagelee, McLeod, Storey, LaPlaunt, Durant, Batho and Derry will be dismissed for failure to state a claim pursuant to 28 U.S.C. §§ 1915(e)(2) and 1915A(b), and 42 U.S.C. § 1997e(c). The Court will serve Plaintiff's Eighth Amendment and retaliation claims against Defendants Vert, Desrochers, Walski, Theel, Threlfall, Escherich, Watson, Richardson, Lieutenant John Doe, Brown, Nurse Jane Doe, Neri and Eicher.[3]

_____

[3]The Court currently lacks sufficient information to effectuate service on Lieutenant John Doe and Nurse Jane Doe.

An Order consistent with this Opinion will be entered.


Dated: <u>October 5, 2011</u>                    <u>/s/ Robert Holmes Bell</u>
                                                ROBERT HOLMES BELL
                                                UNITED STATES DISTRICT JUDGE