UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

JOHN JOSEPH SHULICK,

        Plaintiff,

                                                      Case No. 2:11-cv-73
v.                                           HON. ROBERT HOLMES BELL

MICHIGAN DEPARTMENT OF
CORRECTIONS, et al.,

        Defendant(s).
_____/

## REPORT AND RECOMMENDATION

        Plaintiff John Shulick, an inmate at the Ionia Correctional Facility, filed this *pro se* civil rights action pursuant to 42 U.S.C. § 1983 against Defendants Michigan Department of Corrections (MDOC), Prisoner Health Services, Inc. (PHS), MDOC Director Patricia Caruso and the following Alger Maximum Correctional Facility employees: Wardens John Boynton and Greg McQuiggin; Inspectors (unknown) McDonald and (unknown) Casey; Assistant Deputy Warden (unknown) Maclaren; Assistant Deputy Warden of Housing Jackie Nadeau; Grievance Coordinator (unknown) McLean; Assistant Resident Unit Supervisor (unknown) Hagelee; Sergeants (unknown) Vert and Richard Desrochers; Resident Unit Officer (unknown) Theel; Corrections Officers (unknown) Walski, Harold Threlfall, Richard Escherich, David Watson, James Richardson and (unknown) McLeod; Nurses Michelle Brown and Dawn Eicher; Nurse Supervisor Melissa LaPlaunt; Dr. Jesus Neri; Warden's Administrative Assistant Dawn Eicher; Hearings Investigator (unknown) Durant; and Assistant Resident Unit Supervisors (unknown) Batho and (unknown) Derry. In

addition, Plaintiff sues two unknown parties named "Third Shift Unknown Lieutenant John Doe" and "Unknown Female RN Jane Doe." All of the Defendants named above were employed by the MDOC during the pertinent time period.

Previously, the Court partially dismissed Plaintiff's complaint for failure to state a claim against Defendants MDOC, PHS, Caruso, Boynton, McQuiggin, McDonald, Casey, Maclaren, Nadeau, Hagelee, McLeod, Storey, LaPlaunt, Durant, Batho, and Derry. The Court ordered service of the complaint with regard to Plaintiff's Eight Amendment and retaliation claims against Defendants Vert, Desrochers, Walski, Theel, Threlfall, Escherich, Watson, Richardson, Lieutenant John Doe, Brown, Nurse Jane Doe, Neri, and Eicher (docket # 12).

In count III of the complaint, Plaintiff alleges that all of the named Defendants, including Defendant Neri, "conspired to impede, stifle, and/or thwart the Plaintiff's right to grieve unsatisfactory conditions of his confinement, combined with the 'unnecessary wanton infliction of pain without any penological justification,' in retaliation for the free exercise of a protected constitutional right, and further compounded by a willful, wanton, reckless disregard for the substantial risk of serious harm to the prisoner's health and safety." (Compl., ¶ 89, Page ID#87-88.) In count IV of the complaint, Plaintiff alleges that Defendant Neri, among others, disregarded a substantial risk of harm to the Plaintiff in violation of the Eight Amendment. (Compl., ¶ 90, Page ID#88-89.) Plaintiff seeks declaratory and injunctive relief, as well as an unspecified amount of monetary damages.

Presently before the Court is Defendant Neri's motion to dismiss (docket # 22), pursuant to Fed. R. Civ. P. 12(b)(6). A motion to dismiss under Rule 12(b)(6) tests the sufficiency of the pleading, requiring the court to determine whether the plaintiff would be entitled to relief if

everything alleged in the complaint is true. *Mayer v. Mylod*, 988 F.2d 635, 638 (6th Cir. 1993). "[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of its claim which would entitle [the plaintiff] to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). The court must construe the complaint in the light most favorable to plaintiff. *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974). A judge may not dismiss the complaint simply because he disbelieves the complaint's factual allegations. *Conley*, 355 U.S. at 47.

Generally, a complaint need only give "fair notice of what the plaintiff's claim is and the grounds upon which it rests." *In re Delorean Motor Co. v. Weitzman*, 991 F.2d 1236, 1240 (6th Cir. 1993) (*quoting Conley*, 355 U.S. at 47). The fundamental purpose of pleadings under the Federal Rules of Civil Procedure is to give adequate notice to the parties of each side's claims and to allow cases to be decided on the merits after an adequate development of the facts. *Mayer*, 355 U.S. at 638. While this standard is decidedly liberal, it requires more than the bare assertion of legal conclusions. *Delorean*, 991 F.2d at 1240. "In practice, a complaint must contain either direct or inferential allegations respecting all the material elements to sustain a recovery under some viable legal theory." *Id.* (internal quote omitted).

> The Court stated the facts of this case in an opinion dated October 5, 2011:
>
> On November 14, 2009, at approximately 1:00 a.m., Plaintiff left the restroom in Delta Unit and passed through the lobby where Defendant Officers Walski and Theel were reading "personal paperback books." (Compl., ¶ 37, Page ID#32). Plaintiff accused the officers of violating employee rules and asked how they could be vigilant and alert in their duties if they were distracted by books. The officers told Plaintiff to mind his own business and Officer Walski threatened, "We can make your bit very difficult." (Compl., ¶ 37, Page ID#33). Later that evening when Officers Walski and Theel arrived in Delta Unit for third shift duty, they found a crude pornographic drawing of

what appeared to be Officer Theel posted in the back lobby area of the unit. Officer Theel took down the drawing and contacted the shift supervisor, Lieutenant John Doe. Lieutenant John Doe, Theel and Walski went into Defendant ARUS Haglee's office for a meeting. When Theel emerged from Haglee's office, she announced in a loud voice, "Every one of you people who receive tickets tonight have Mr. Shulick to thank for it." (Compl., ¶ 39, Page ID#34). Plaintiff denies that he created the pornographic rendering of Theel and claims that he never was questioned about the drawing by prison officials.

The following day, Plaintiff filed two grievances against Defendants Walski and Theel. In one grievance, Plaintiff complained that Walski and Theel violated employee rules by reading books while on duty and threatening to make Plaintiff's incarceration difficult. (*See* URF-09-11-3415-28x, Exhibit B-1, Page ID#217 ). In the other grievance, Plaintiff claimed that Theel created a hostile environment for Plaintiff by blaming him for the issuance of misconduct tickets. (*See* URF-09-11-3413-28x, Exhibit B-1, Page ID#222 ). According to Plaintiff, the first grievance was improperly rejected by the Grievance Coordinator, Defendant McLean, thus preventing him from exhausting his available administrative remedies against Defendants Walski and Theel. Defendant Sergeant Vert reviewed the second misconduct with Plaintiff on November 18, 2009. Plaintiff explained to Vert that he was concerned about Walski and Theel being distracted by books because prisoners were making and passing knives through the unit "right under Officer Theel and Walski's unsuspecting, detracted [sic] noses." (Compl., ¶ 43, Page ID#38).

On November 25, 2009, Plaintiff gave a statement at a misconduct hearing on behalf of another prisoner, Brian Warne. Later that evening Warne told Plaintiff to "watch his back" because Theel was very angry that Warne had successfully defended against the misconduct charge and would blame Plaintiff for his supporting testimony. (Compl., ¶ 45, Page ID#45).

On November 28, 2009, Plaintiff went to bed at approximately 11:30 p.m. Plaintiff claims that about an hour later, he suddenly was awakened by several individuals dragging him from his bed and pushing him to the tile floor. As Plaintiff lay face-down on the floor, one of the individuals ordered him to stop resisting and place his hands behind his back. When Plaintiff realized that the individuals were custody staff, not other prisoners, he attempted to comply with the order. Plaintiff alleges that the "movement team" involved in the incident included Defendants Desrochers, Escherich, Threlfall,

Watson and Richardson, who was operating a video camera. Plaintiff claims that he was unable to comply with the order due to the force being used by the officers to pull his arms, so the officers twisted his arms behind his back and placed him in handcuffs. As Plaintiff lay handcuffed on the floor, Defendants Threlfall and Watson began to kick and stomp Plaintiff's lower extremities. Plaintiff alleges that Defendants Desrochers, Escherich and Richardson failed to intervene to protect him from Threlfall and Watson. When the kicking and stomping ceased, one of the movement team members jumped on Plaintiff with his full weight and put his knee into Plaintiff's back. A movement team member jumped on Plaintiff's back a second time and jammed a cylindrical metal object into the back of Plaintiff's neck, which caused him severe pain. When Plaintiff attempted to turn over, he was kicked again.

Plaintiff contends that he never resisted or struck any of the officers during the incident. Defendant Threlfall informed Plaintiff that they came to move him to another unit, but did not respond when Plaintiff asked why he was being moved in the middle of the night. Plaintiff's feet were shackled by another movement team member. Plaintiff was ordered to stand, but was unable to do so as a result of the injuries that he had sustained to his left leg, buttocks and groin area during the assault. Plaintiff, who remained handcuffed and shackled, was taken in a wheelchair to health services. Plaintiff believes that Lieutenant John Doe was the one who authorized the movement team.

According to a critical incident report written by Defendant Watson, Defendant Desrochers made repeated loud orders for Plaintiff to move to another housing unit, but Plaintiff ignored the orders and pretended to be asleep. (Critical Incident Report, Exhibit A-1, Page ID#98). When Desrochers shook Plaintiff's bunk, he allegedly responded with exaggerated snoring noises. The movement team was assembled and Officer Richardson was given a video camera to record the incident. After Plaintiff ignored additional direct orders to get out of his bunk, the team attempted to apply restraints. Officer Threlfall was told to control Plaintiff's upper body, Officer Watson was told to control his legs and Officer Escherich was told to apply the restraints. The critical incident report states that Plaintiff resisted the officers and struck Defendant Threlfall in the chest before being restrained. The report further stated that due to a problem with the video camera, Defendant Richardson did not begin to record the incident until Plaintiff was taken to health services.

Plaintiff alleges that when he arrived in health services, he was examined by Defendant Nurse Brown. Plaintiff told Brown that he thought his leg was broken. He also informed Brown that he suffered from a chronic blood disease known as Thrombocytosis/ Myeloproliferative disorder. Brown told Plaintiff that there was nothing wrong with his leg and that his blood disease was not relevant to his complaint, and told him to leave.

Plaintiff was taken from health services to the segregation unit, where he was left on the floor of the unit's intake cage. As Plaintiff lay on the floor in excruciating plain from his injuries, an unknown officer dragged him backward across the floor by his manacled wrists to the front of the cage. Plaintiff alleges that he lost consciousness as result of the intense pain. When Plaintiff awoke the following morning, he was ordered to strip for a search. As he removed his clothing, Plaintiff noticed that he had urinated on himself during the night. Plaintiff claims that he lay naked on the floor of the intake cage for twenty minutes calling for a doctor before Nurse Jane Doe came to examine his injuries. Nurse Jane Doe told Plaintiff the swelling in his leg was minimal and "if Brown told him there is nothing wrong with it, then there's nothing wrong with it." (Compl., Page ID#49). Plaintiff was given clothing and ordered to walk to his cell. Plaintiff claims that he could not comply with the order because he was physically incapable of standing or walking. Because Plaintiff did not comply with the order, Officer Ortiz issued a major misconduct for disobeying a direct order. Earlier that night, Plaintiff also had received a major misconduct ticket from Defendant McLeod for failing to comply with his order to "stand and strip." When Plaintiff did not comply with Ortiz's order, Officer Smith said to Plaintiff, "If you don't stand up and walk to cell S-110 right now, I'm going to drag you all the way down there by your bad leg!" (Compl., Page ID#50). However, Officers Ortiz and Smith ultimately took Plaintiff to his cell in a wheelchair.

Plaintiff claims that despite his repeated cries for medical assistance, he did not receive any further attention from medical staff for three days. Plaintiff was in such severe pain during that time that he was unable to eat or drink. On December 1, 2009, Dr. Jesus Neri examined Plaintiff's leg, which was extremely swollen and discolored. Plaintiff told Dr. Neri that he was in excruciating pain and asked to be taken to the local hospital emergency room. Plaintiff also asked to the see Dr. Bolmer, the specialist who treated his Thrombocytosis. Dr. Neri gave Plaintiff some Ultram, a hot water bottle and crutches. The doctor also advised Plaintiff to eat and

dismissed him.  Dr. Neri examined Plaintiff's leg again two days later, on December 3, but did not provide any further treatment.  On December 4, Plaintiff began experiencing severe chest pains and Dr. Stallman authorized his transfer to War Memorial Hospital.  The emergency room doctor, Dr. Ranta, ordered an ultrasound of Plaintiff's left leg, which revealed a blood clot. Dr. Ranta also ordered morphine to ease Plaintiff's pain. Plaintiff was released from the hospital on December 5 or 6 and returned to the segregation unit at Alger.

On December 9, 2009, Plaintiff was taken to the nurse's station within the segregation unit where Defendant Nurse Eicher informed Plaintiff that Dr. Ranta had advised the medical service provider about the blood clot in Plaintiff leg.  Plaintiff was placed on Lovinox injections and an oral Coumadin regimen to treat the clot. Plaintiff was given only regular strength Tylenol, which did nothing to ease his severe leg pain.   Plaintiff ultimately was sent for an off-site appointment with Dr. Bolmer several months later on May 6, 2010. Plaintiff claims that he continues to suffer from pain and numbness in his left leg.  He also suffers from emotional distress resulting from the brutal assault perpetrated by members of the movement team.  In addition, Plaintiff asserts that he "continues to experience the psychologically 'chilling effects' of the herein named and/or described.  Defendants/Conspirators definitive, longstanding, widespread policy, custom and usage practice of de facto deliberate indifference/intimidation/retaliation so pervasively enforced by the governmental entity and its agents/employees as to have the force of law." (Compl., 51, Page ID#59).

Plaintiff claims that during the 45-day period that he was in administrative segregation, he repeatedly kited Defendant Investigators McDonald and Casey and Defendants Batho and Derry asking for information from his legal footlocker so that he could file the Step II appeal for Grievance No. URF 09-11-3415- 28Z, but he received no response.  As a result, his Step II grievance appeal was rejected as untimely.  Plaintiff contends that Defendants McDonald, Casey, Batho and Derry conspired to prevent him from exhausting his administrative remedies in violation of his right of access to the courts. Plaintiff further alleges that Defendants "conspired to retaliate against the prisoner for exercising his United States Constitutional First Amendment right to grieve alleged violations of policy or procedure, or unsatisfactory conditions of confinement that directly affects [sic] his health and/or safety." (Compl., Page ID#63).

While he was in administrative segregation Plaintiff also kited Defendant Wardens Boynton and McQuiggin to inform them that his reading glasses had been lost or stolen under the direct care and supervision of Defendant Theel. Plaintiff claims that his kites were not answered in a timely manner. After Plaintiff was released from segregation on January 11, 2010, he discovered that certain legal property relating to a pending civil rights action had been confiscated. Plaintiff again kited Defendants Boynton and McQuiggin, but received no response. Plaintiff contends that Defendants Boynton and McQuiggin, along with Defendants McDonald, Casey, Maclaren, Nadeau and Caruso, failed to properly supervise their subordinate staff members and have instituted and maintained policies, customs or usages that resulted in the violation of Plaintiff's constitutional rights by prison staff.

Following a misconduct hearing on December 15, 2009, Plaintiff was found guilty of the disobeying-a-direct-order charge brought by Officer McLeod. Plaintiff requested a hearing packet from Defendant Durant in order to request a rehearing. Plaintiff's request for rehearing was returned to him on January 15, 2010, because the hearing packet did not include the misconduct report. Plaintiff was required to provide the complete rehearing packet within thirty days in order to continue with his appeal. Plaintiff claims that he repeatedly kited Defendant Durant for a complete hearing packet, but received no response. When Plaintiff filed a grievance regarding the matter on February 10, 2010, Durant claimed that he was unaware of Plaintiff's request and provided him with the complete hearing packet on February 16, 2010. (Step I Grievance Response, No. URF-1002-0484-O7F, Exhibit B-17, Page ID#326). Because more than thirty days had passed, Plaintiff claims that his appeal was dismissed.

Plaintiff brings six legal claims against Defendants. In Count I, Plaintiff contends that Defendants Vert, Walski, Theel, Desroches, Escherich, Threlfall, Watson, Richardson and Lieutenant John Doe retaliated against him for filing grievances by assaulting him on November 28, 2009. Plaintiff alleges in Count II that Defendants Desrochers, Escherich and Richardson violated his Eighth Amendment rights when they failed to protect him from assault by Defendants Threlfall and Watson. In Count III of the complaint, Plaintiff alleges that all of the named Defendants "conspir[ed] to impede, stifle and/or thwart the Plaintiff's right to grieve unsatisfactory conditions of his confinement, combined with the 'unnecessary wanton infliction of pain without any penological justification,' in retaliation for the free exercise of a protected

>      constitutional right, and further compounded by a willful, wanton, reckless disregard for the substantial risk of serious harm to the prisoner's health and safety." (Compl. ¶ 89, Page ID#87). Plaintiff contends in Count IV that Defendants MDOC, PHS, Brown, Jane Doe, LaPlaunt, Eicher and Neri failed to provide him with proper medical treatment for the injuries sustained as a result of the assault in violation of the Eighth Amendment.

Docket # 11, at 2-10.

       Plaintiff's first claim against Defendant Neri is found in count III of the complaint. Plaintiff alleges that all of the named Defendants, including Defendant Neri, "conspired to impede, stifle, and/or thwart the Plaintiff's right to grieve unsatisfactory conditions of his confinement, combined with the 'unnecessary wanton infliction of pain without any penological justification,' in retaliation for the free exercise of a protected constitutional right, and further compounded by a willful, wanton, reckless disregard for the substantial risk of serious harm to the prisoner's health and safety." (Compl., ¶ 89, Page ID#87-88). In count IV of the complaint, Plaintiff alleges that Defendant Neri, among others, disregarded a substantial risk of harm to the Plaintiff in violation of the Eight Amendment. (Compl., ¶ 90, Page ID#88-89). Plaintiff's claims specific to Defendant Neri appear to be that Defendant Neri failed to refer him to a specialist, failed to provide him with different pain medication, and failed to provide him with adequate and timely medical attention. (Compl., ¶ 59-61, Page ID#51-53).

       Defendant Neri asserts that Plaintiff's claims are not constitutional in nature, but rather, mere disagreements with his medical treatment decisions. (Docket # 22, at 3). Additionally, Defendant Neri asserts that Plaintiff's conspiracy claim is "no more than a threadbare recitation of the cause of action of conspiracy." (docket # 22, at 4). First, the Court will address Plaintiff's Eight Amendment claim.

The Eighth Amendment prohibits the infliction of cruel and unusual punishment against those convicted of crimes. U.S. Const. amend. VIII. The Eighth Amendment obligates prison authorities to provide medical care to incarcerated individuals, as a failure to provide such care would be inconsistent with contemporary standards of decency. *Estelle v. Gamble*, 429 U.S. 102, 103-04 (1976). The Eighth Amendment is violated when a prison official is deliberately indifferent to the serious medical needs of a prisoner. *Id.* at 104-05; *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001).

A claim for the deprivation of adequate medical care has an objective and a subjective component. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). To satisfy the objective component, the plaintiff must allege that the medical need at issue is sufficiently serious. *Id.* In other words, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm. *Id.* The objective component of the adequate medical care test is satisfied "[w]here the seriousness of a prisoner's need [ ] for medical care is obvious even to a lay person." *Blackmore v. Kalamazoo County*, 390 F.3d 890, 899 (6th Cir. 2004). If, however the need involves "minor maladies or non-obvious complaints of a serious need for medical care," *Blackmore*, 390 F.3d at 898, the inmate must "place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment." *Napier v. Madison County*, 238 F.3d 739, 742 (6th Cir. 2001).

The subjective component requires an inmate to show that prison officials have "a sufficiently culpable state of mind in denying medical care." *Brown v. Bargery*, 207 F.3d 863, 867 (6th Cir. 2000) (citing *Farmer*, 511 U.S. at 834). Deliberate indifference "entails something more than mere negligence," *Farmer,* 511 U.S. at 835, but can be "satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id.*

Under *Farmer*, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837.

Not every claim by a prisoner that he has received inadequate medical treatment states a violation of the Eighth Amendment. *Estelle*, 429 U.S. at 105. As the Supreme Court explained:

> [A]n inadvertent failure to provide adequate medical care cannot be said to constitute an unnecessary and wanton infliction of pain or to be repugnant to the conscience of mankind. Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs.

*Estelle*, 429 U.S. at 105-06 (quotations omitted). Thus, differences in judgment between an inmate and prison medical personnel regarding the appropriate medical diagnoses or treatment are not enough to state a deliberate indifference claim. *Sanderfer v. Nichols*, 62 F.3d 151, 154-55 (6th Cir. 1995); *Ward v. Smith*, No. 95-6666, 1996 WL 627724, at *1 (6th Cir. Oct. 29, 1996). This is so even if the misdiagnosis results in an inadequate course of treatment and considerable suffering. *Gabehart v. Chapleau*, No. 96-5050, 1997 WL 160322, at *2 (6th Cir. Apr. 4, 1997).

The Sixth Circuit distinguishes "between cases where the complaint alleges a complete denial of medical care and those cases where the claim is that a prisoner received inadequate medical treatment." *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976). Where, as here, "a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Id.*; *see also Perez v. Oakland County*, 466 F.3d 416, 434 (6th Cir. 2006); *Kellerman v. Simpson*, 258 F. App'x 720, 727 (6th Cir. 2007);

*McFarland v. Austin*, 196 F. App'x 410 (6th Cir. 2006); *Edmonds v. Horton*, 113 F. App'x 62, 65 (6th Cir. 2004); *Brock v. Crall*, 8 F. App'x 439, 440 (6th Cir. 2001); *Berryman v. Rieger*, 150 F.3d 561, 566 (6th Cir. 1998).

Plaintiff's claim does not allege a complete denial of medical care, but rather, alleges that the he received inadequate medical treatment. As such, the Court should not second guess the medical judgments of Defendant Neri in this case. There is no evidence that Defendant Neri acted with a culpable state of mind in treating Plaintiff or that Defendant Neri's actions or omissions were sufficiently harmful to rise to the level of deliberate indifference to serious medical needs. Although Plaintiff disagrees with Defendant Neri's method of medical treatment, he fails to allege facts that would entitle him to Eighth Amendment relief even if they were proven true.

Defendant Neri asserts that Plaintiff was treated extensively for his alleged injuries. Plaintiff was seen repeatedly by doctors; medical staff sent him to the hospital within a week of his injury, provided him pain medications and blood thinners for over nine months, placed him in medical segregation, consulted with a hematologist, and performed blood work and other diagnostic testing. (docket # 22, at 2). These actions by Defendant Neri and other medical staff fail to rise to the level of willful, wanton, reckless disregard for the substantial risk of serious harm to the prisoner's health and safety.

Viewed in a light most favorable to Plaintiff, Plaintiff can prove no set of facts in support of his Eighth Amendment claim which would entitle Plaintiff to relief against Defendant Neri. Plaintiff's failure to state an Eighth Amendment claim renders Plaintiff's conspiracy claim against Defendant Neri meritless. Even if Plaintiff had alleged facts that would constitute an Eighth Amendment claim, Plaintiff fails to state a plausible claim of conspiracy.

In an opinion dated October 5, 2011, the Court addressed Plaintiff's allegations of conspiracy against all named Defendants. The Court stated:

> To state a claim for conspiracy, a plaintiff must plead with particularity, as vague and conclusory allegations unsupported by material facts are insufficient. *Twombly*, 550 U.S. at 565 (recognizing that allegations of conspiracy must be supported by allegations of fact that support a "plausible suggestion of conspiracy," not merely a "possible" one); *Fieger v. Cox*, 524 F.3d 770, 776 (6th Cir. 2008); *Spadafore v. Gardner*, 330 F.3d 849, 854 (6th Cir. 2003); *Gutierrez v. Lynch*, 826 F.2d 1534, 1538 (6th Cir. 1987); *Smith v. Rose*, 760 F.2d 102,106 (6th Cir. 1985); *Pukyrys v. Olson*, No. 95-1778, 1996 WL 636140, at *1 (6th Cir. Oct. 30, 1996). A plaintiff's allegations must show (1) the existence or execution of the claimed conspiracy, (2) overt acts relating to the promotion of the conspiracy, (3) a link between the alleged conspirators, and (4) an agreement by the conspirators to commit an act depriving plaintiff of a federal right. *Lepley v. Dresser*, 681 F. Supp. 418, 422 (W.D. Mich. 1988). "[V]ague allegations of a wide-ranging conspiracy are wholly conclusory and are, therefore, insufficient to state a claim." *Hartsfield v. Mayer*, No. 95-1411, 1996 WL 43541, at *3 (6th Cir. Feb. 1, 1996).
>
> Plaintiff's allegations of conspiracy are conclusory and speculative. His allegations, even viewed in the light most favorable to Plaintiff, describe a number of discrete facts that occurred over a period of time involving numerous prison employees. Plaintiff has provided no allegations establishing a link between the alleged conspirators or any agreement between them. As the Supreme Court has held, such allegations, while hinting at a "possibility" of conspiracy, do not contain "enough factual matter (taken as true) to suggest that an agreement was made." *Twombly*, 550 U.S. at 556. Instead, the Court has recognized that although parallel conduct may be consistent with an unlawful agreement, it is insufficient to state a claim where that conduct "was not only compatible with, but indeed was more likely explained by, lawful, unchoreographed . . . behavior." *Iqbal*, 129 S. Ct. at 1250. In light of the far more likely possibility that the various incidents complained of by Plaintiff were unrelated, Plaintiff fails to state a plausible claim of conspiracy.

Docket #11, at 15-16. Therefore, for the reasons stated previously by the court, Plaintiff's conspiracy claim against Defendant Neri is properly dismissed.

In summary, in the opinion of the undersigned, Plaintiff's claim fails to allege facts that would entitle Plaintiff to relief against Defendant Neri. Therefore, Defendant Neri's Motion to Dismiss (docket #22) is properly granted.

NOTICE TO PARTIES: Objections to this Report and Recommendation must be served on opposing parties and filed with the Clerk of the Court within fourteen (14) days of receipt of this Report and Recommendation. 28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b); W.D. Mich. LCivR 72.3(b). Failure to file timely objections constitutes a waiver of any further right to appeal. *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). *See also Thomas v. Arn*, 474 U.S. 140 (1985).

/s/ Timothy P. Greeley
TIMOTHY P. GREELEY
UNITED STATES MAGISTRATE JUDGE

Dated: July 31, 2012