UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

_____

JOHN JOSEPH SHULICK,

          Plaintiff,                          Case No. 2:11-cv-73

v.                                              Honorable Robert Holmes Bell

MICHIGAN DEPARTMENT OF
CORRECTIONS et al.,

          Defendants.

_____/

## REPORT AND RECOMMENDATION

Plaintiff John Joseph Shulick, an inmate currently confined at the Earnest C. Brooks Correctional Facility, filed this *pro se* civil rights action pursuant to 42 U.S.C. § 1983 against the Michigan Department of Corrections (MDOC), Prisoner Health Services, Inc., MDOC Director Patricia Caruso and the following Alger employees: Wardens John Boynton and Greg McQuiggin; Inspectors (unknown) McDonald and (unknown) Casey; Assistant Deputy Warden (unknown) Maclaren; Assistant Deputy Warden of Housing Jackie Nadeau; Grievance Coordinator (unknown)McLean; Assistant Resident Unit Supervisor (unknown) Haglee; Sergeants (unknown) Vert and Richard Desrochers; Resident Unit Officer (unknown) Theel; Corrections Officers (unknown) Walski, Harold Threlfall, Richard Escherich, David Watson, James Richardson and (unknown) McLeod; Nurses Michelle Brown and Dawn Eicher; Nurse Supervisor Melissa LaPlaunt; Dr. Jesus Neri; Warden's Administrative Assistant Dawn Eicher; Hearings Investigator (unknown) Durant; and Assistant Resident Unit Supervisors (unknown) Batho and (unknown) Derry. In

addition, Plaintiff sues two unknown parties named "Third Shift Unknown Lieutenant John Doe" and "Unknown Female RN Jane Doe." All of the Defendants named above were employed by the MDOC during the pertinent time period.

Previously, the Court dismissed Plaintiff's complaint for failure to state a claim against Defendants MDOC, PHS, Caruso, Boynton, McQuiggin, McDonald, Casey, Maclaren, Nadeau, Hagelee, McLeod, Storey, LaPlaunt, Durant, Batho, and Derry. The Court ordered service of the complaint with regard to Plaintiff's Eight Amendment and retaliation claims against Defendants Vert, Desrochers, Walski, Theel, Threlfall, Escherich, Watson, Richardson, Lieutenant John Doe, Brown, Nurse Jane Doe, Neri, and Eicher (docket # 12). In addition, the court has since dismissed Defendants Neri and Wilson from this action (docket #113 and #156).

Presently before the Court is Plaintiff's Motion for Summary Judgment, pursuant to Fed. R. Civ. P. 56 (docket #163). Defendants have filed a response and the matter is ready for decision. Summary judgment is appropriate only if the moving party establishes that there is no genuine issue of material fact for trial and that he is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986). If the movant carries the burden of showing there is an absence of evidence to support a claim or defense, then the party opposing the motion must demonstrate by affidavits, depositions, answers to interrogatories, and admissions on file, that there is a genuine issue of material fact for trial. *Id.* at 324-25. The nonmoving party cannot rest on its pleadings but must present "specific facts showing that there is a genuine issue for trial." *Id.* at 324 (quoting Fed. R. Civ. P. 56(e)). The evidence must be viewed in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). Thus, any direct evidence offered by the plaintiff in response to a summary judgment

motion must be accepted as true. *Muhammad v. Close*, 379 F.3d 413, 416 (6th Cir. 2004) (*citing Adams v. Metiva*, 31 F.3d 375, 382 (6th Cir. 1994)). However, a mere scintilla of evidence in support of the nonmovant's position will be insufficient. *Anderson*, 477 U.S. at 251-52; *see also Leahy v. Trans Jones, Inc.*, 996 F.2d 136, 139 (6th Cir. 1993) (single affidavit, in presence of other evidence to the contrary, failed to present genuine issue of fact); *cf. Moore, Owen, Thomas & Co. v. Coffey*, 992 F.2d 1439, 1448 (6th Cir. 1993) (single affidavit concerning state of mind created factual issue).

> The Court stated the facts of this case in an opinion dated October 5, 2011:
>
> On November 14, 2009, at approximately 1:00 a.m., Plaintiff left the restroom in Delta Unit and passed through the lobby where Defendant Officers Walski and Theel were reading "personal paperback books." (Compl., ¶ 37, Page ID#32). Plaintiff accused the officers of violating employee rules and asked how they could be vigilant and alert in their duties if they were distracted by books. The officers told Plaintiff to mind his own business and Officer Walski threatened, "We can make your bit very difficult." (Compl., ¶ 37, Page ID#33). Later that evening when Officers Walski and Theel arrived in Delta Unit for third shift duty, they found a crude pornographic drawing of what appeared to be Officer Theel posted in the back lobby area of the unit. Officer Theel took down the drawing and contacted the shift supervisor, Lieutenant John Doe. Lieutenant John Doe, Theel and Walski went into Defendant ARUS Haglee's office for a meeting. When Theel emerged from Haglee's office, she announced in a loud voice, "Every one of you people who receive tickets tonight have Mr. Shulick to thank for it." (Compl., ¶ 39, Page ID#34). Plaintiff denies that he created the pornographic rendering of Theel and claims that he never was questioned about the drawing by prison officials.
>
> The following day, Plaintiff filed two grievances against Defendants Walski and Theel. In one grievance, Plaintiff complained that Walski and Theel violated employee rules by reading books while on duty and threatening to make Plaintiff's incarceration difficult. (*See* URF-09-11-3415-28x, Exhibit B-1, Page ID#217 ). In the other grievance, Plaintiff claimed that Theel created a hostile environment for Plaintiff by blaming him for the issuance of misconduct tickets. (*See* URF-09-11-3413-28x, Exhibit B-1, Page ID#222 ). According to Plaintiff, the

first grievance was improperly rejected by the Grievance Coordinator, Defendant McLean, thus preventing him from exhausting his available administrative remedies against Defendants Walski and Theel. Defendant Sergeant Vert reviewed the second misconduct with Plaintiff on November 18, 2009. Plaintiff explained to Vert that he was concerned about Walski and Theel being distracted by books because prisoners were making and passing knives through the unit "right under Officer Theel and Walski's unsuspecting, detracted [sic] noses." (Compl., ¶ 43, Page ID#38).

On November 25, 2009, Plaintiff gave a statement at a misconduct hearing on behalf of another prisoner, Brian Warne. Later that evening Warne told Plaintiff to "watch his back" because Theel was very angry that Warne had successfully defended against the misconduct charge and would blame Plaintiff for his supporting testimony. (Compl., ¶ 45, Page ID#45).

On November 28, 2009, Plaintiff went to bed at approximately 11:30 p.m. Plaintiff claims that about an hour later, he suddenly was awakened by several individuals dragging him from his bed and pushing him to the tile floor. As Plaintiff lay face-down on the floor, one of the individuals ordered him to stop resisting and place his hands behind his back. When Plaintiff realized that the individuals were custody staff, not other prisoners, he attempted to comply with the order. Plaintiff alleges that the "movement team" involved in the incident included Defendants Desrochers, Escherich, Threlfall, Watson and Richardson, who was operating a video camera. Plaintiff claims that he was unable to comply with the order due to the force being used by the officers to pull his arms, so the officers twisted his arms behind his back and placed him in handcuffs. As Plaintiff lay handcuffed on the floor, Defendants Threlfall and Watson began to kick and stomp Plaintiff's lower extremities. Plaintiff alleges that Defendants Desrochers, Escherich and Richardson failed to intervene to protect him from Threlfall and Watson. When the kicking and stomping ceased, one of the movement team members jumped on Plaintiff with his full weight and put his knee into Plaintiff's back. A movement team member jumped on Plaintiff's back a second time and jammed a cylindrical metal object into the back of Plaintiff's neck, which caused him severe pain. When Plaintiff attempted to turn over, he was kicked again.

Plaintiff contends that he never resisted or struck any of the officers during the incident. Defendant Threlfall informed Plaintiff that they came to move him to another unit, but did not respond when Plaintiff

asked why he was being moved in the middle of the night. Plaintiff's feet were shackled by another movement team member. Plaintiff was ordered to stand, but was unable to do so as a result of the injuries that he had sustained to his left leg, buttocks and groin area during the assault. Plaintiff, who remained handcuffed and shackled, was taken in a wheelchair to health services. Plaintiff believes that Lieutenant John Doe was the one who authorized the movement team.

According to a critical incident report written by Defendant Watson, Defendant Desrochers made repeated loud orders for Plaintiff to move to another housing unit, but Plaintiff ignored the orders and pretended to be asleep. (Critical Incident Report, Exhibit A-1, Page ID#98). When Desrochers shook Plaintiff's bunk, he allegedly responded with exaggerated snoring noises. The movement team was assembled and Officer Richardson was given a video camera to record the incident. After Plaintiff ignored additional direct orders to get out of his bunk, the team attempted to apply restraints. Officer Threlfall was told to control Plaintiff's upper body, Officer Watson was told to control his legs and Officer Escherich was told to apply the restraints. The critical incident report states that Plaintiff resisted the officers and struck Defendant Threlfall in the chest before being restrained. The report further stated that due to a problem with the video camera, Defendant Richardson did not begin to record the incident until Plaintiff was taken to health services.

Plaintiff alleges that when he arrived in health services, he was examined by Defendant Nurse Brown. Plaintiff told Brown that he thought his leg was broken. He also informed Brown that he suffered from a chronic blood disease known as Thrombocytosis/ Myeloproliferative disorder. Brown told Plaintiff that there was nothing wrong with his leg and that his blood disease was not relevant to his complaint, and told him to leave.

Plaintiff was taken from health services to the segregation unit, where he was left on the floor of the unit's intake cage. As Plaintiff lay on the floor in excruciating plain from his injuries, an unknown officer dragged him backward across the floor by his manacled wrists to the front of the cage. Plaintiff alleges that he lost consciousness as result of the intense pain. When Plaintiff awoke the following morning, he was ordered to strip for a search. As he removed his clothing, Plaintiff noticed that he had urinated on himself during the night. Plaintiff claims that he lay naked on the floor of the intake cage for twenty minutes calling for a doctor before Nurse Jane Doe came to examine his injuries. Nurse Jane Doe told Plaintiff the swelling in his leg was

minimal and "if Brown told him there is nothing wrong with it, then there's nothing wrong with it." (Compl., Page ID#49). Plaintiff was given clothing and ordered to walk to his cell. Plaintiff claims that he could not comply with the order because he was physically incapable of standing or walking. Because Plaintiff did not comply with the order, Officer Ortiz issued a major misconduct for disobeying a direct order. Earlier that night, Plaintiff also had received a major misconduct ticket from Defendant McLeod for failing to comply with his order to "stand and strip." When Plaintiff did not comply with Ortiz's order, Officer Smith said to Plaintiff, "If you don't stand up and walk to cell S-110 right now, I'm going to drag you all the way down there by your bad leg!" (Compl., Page ID#50). However, Officers Ortiz and Smith ultimately took Plaintiff to his cell in a wheelchair.

Plaintiff claims that despite his repeated cries for medical assistance, he did not receive any further attention from medical staff for three days. Plaintiff was in such severe pain during that time that he was unable to eat or drink. On December 1, 2009, Dr. Jesus Neri examined Plaintiff's leg, which was extremely swollen and discolored. Plaintiff told Dr. Neri that he was in excruciating pain and asked to be taken to the local hospital emergency room. Plaintiff also asked to the see Dr. Bolmer, the specialist who treated his Thrombocytosis. Dr. Neri gave Plaintiff some Ultram, a hot water bottle and crutches. The doctor also advised Plaintiff to eat and dismissed him. Dr. Neri examined Plaintiff's leg again two days later, on December 3, but did not provide any further treatment. On December 4, Plaintiff began experiencing severe chest pains and Dr. Stallman authorized his transfer to War Memorial Hospital. The emergency room doctor, Dr. Ranta, ordered an ultrasound of Plaintiff's left leg, which revealed a blood clot. Dr. Ranta also ordered morphine to ease Plaintiff's pain. Plaintiff was released from the hospital on December 5 or 6 and returned to the segregation unit at Alger.

On December 9, 2009, Plaintiff was taken to the nurse's station within the segregation unit where Defendant Nurse Eicher informed Plaintiff that Dr. Ranta had advised the medical service provider about the blood clot in Plaintiff leg. Plaintiff was placed on Lovinox injections and an oral Coumadin regimen to treat the clot. Plaintiff was given only regular strength Tylenol, which did nothing to ease his severe leg pain. Plaintiff ultimately was sent for an off-site appointment with Dr. Bolmer several months later on May 6, 2010. Plaintiff claims that he continues to suffer from pain and numbness

in his left leg. He also suffers from emotional distress resulting from the brutal assault perpetrated by members of the movement team. In addition, Plaintiff asserts that he "continues to experience the psychologically 'chilling effects' of the herein named and/or described. Defendants/Conspirators definitive, longstanding, widespread policy, custom and usage practice of de facto deliberate indifference/intimidation/retaliation so pervasively enforced by the governmental entity and its agents/employees as to have the force of law." (Compl., 51, Page ID#59).

Plaintiff claims that during the 45-day period that he was in administrative segregation, he repeatedly kited Defendant Investigators McDonald and Casey and Defendants Batho and Derry asking for information from his legal footlocker so that he could file the Step II appeal for Grievance No. URF 09-11-3415- 28Z, but he received no response. As a result, his Step II grievance appeal was rejected as untimely. Plaintiff contends that Defendants McDonald, Casey, Batho and Derry conspired to prevent him from exhausting his administrative remedies in violation of his right of access to the courts. Plaintiff further alleges that Defendants "conspired to retaliate against the prisoner for exercising his United States Constitutional First Amendment right to grieve alleged violations of policy or procedure, or unsatisfactory conditions of confinement that directly affects [sic] his health and/or safety." (Compl., Page ID#63).

While he was in administrative segregation Plaintiff also kited Defendant Wardens Boynton and McQuiggin to inform them that his reading glasses had been lost or stolen under the direct care and supervision of Defendant Theel. Plaintiff claims that his kites were not answered in a timely manner. After Plaintiff was released from segregation on January 11, 2010, he discovered that certain legal property relating to a pending civil rights action had been confiscated. Plaintiff again kited Defendants Boynton and McQuiggin, but received no response. Plaintiff contends that Defendants Boynton and McQuiggin, along with Defendants McDonald, Casey, Maclaren, Nadeau and Caruso, failed to properly supervise their subordinate staff members and have instituted and maintained policies, customs or usages that resulted in the violation of Plaintiff's constitutional rights by prison staff.

Following a misconduct hearing on December 15, 2009, Plaintiff was found guilty of the disobeying-a-direct-order charge brought by Officer McLeod. Plaintiff requested a hearing packet from Defendant Durant in order to request a rehearing. Plaintiff's request for

rehearing was returned to him on January 15, 2010, because the
hearing packet did not include the misconduct report. Plaintiff was
required to provide the complete rehearing packet within thirty days
in order to continue with his appeal. Plaintiff claims that he
repeatedly kited Defendant Durant for a complete hearing packet, but
received no response. When Plaintiff filed a grievance regarding the
matter on February 10, 2010, Durant claimed that he was unaware of
Plaintiff's request and provided him with the complete hearing packet
on February 16, 2010. (Step I Grievance Response, No. URF-1002-
0484-O7F, Exhibit B-17, Page ID#326). Because more than thirty
days had passed, Plaintiff claims that his appeal was dismissed.

Plaintiff brings six legal claims against Defendants. In Count I,
Plaintiff contends that Defendants Vert, Walski, Theel, Desroches,
Escherich, Threlfall, Watson, Richardson and Lieutenant John Doe
retaliated against him for filing grievances by assaulting him on
November 28, 2009. Plaintiff alleges in Count II that Defendants
Desrochers, Escherich and Richardson violated his Eighth
Amendment rights when they failed to protect him from assault by
Defendants Threlfall and Watson. In Count III of the complaint,
Plaintiff alleges that all of the named Defendants "conspir[ed] to
impede, stifle and/or thwart the Plaintiff's right to grieve
unsatisfactory conditions of his confinement, combined with the
'unnecessary wanton infliction of pain without any penological
justification,' in retaliation for the free exercise of a protected
constitutional right, and further compounded by a willful, wanton,
reckless disregard for the substantial risk of serious harm to the
prisoner's health and safety." (Compl. ¶ 89, Page ID#87). Plaintiff
contends in Count IV that Defendants MDOC, PHS, Brown, Jane
Doe, LaPlaunt, Eicher and Neri failed to provide him with proper
medical treatment for the injuries sustained as a result of the assault
in violation of the Eighth Amendment.

*Shulick v. Michigan Department of Corrections*, docket # 11, at 2-10.

As noted by Defendants, Plaintiff's motion for summary judgment (docket #163) was filed on December 16, 2013, well past the September 28, 2012, deadline for filing a dispositive motion (docket #77). However, even if Plaintiff's motion had been timely filed, it would still not be properly granted. In his motion, Plaintiff asserts that Defendants are not entitled to qualified immunity because they violated Plaintiff's clearly established First and Eighth Amendment rights.

- 8 -

Plaintiff seeks a "summary judgment" to that effect. Plaintiff reasserts the facts set forth in his complaint.

In response to Plaintiff's motion for summary judgment, Defendants Brown, Desrochers, Dawn Eicher, Richard Escherich, James Richardson, Unknown Theel, Harold Threlfall, Unknown Vert, Unknown Walski, David Watson, Unknown Watson contend that Plaintiff's version of the facts diverges greatly from reality. Defendants offer the affidavits of Defendant Desrochers, Threlfall, Escherich, Watson, Brown and Eicher to support their version of the events. *See* Defendants' Exhibits A-F.

According to Defendants Desrochers and Threlfall, Plaintiff resisted efforts to be escorted from his bunk, and stated that Plaintiff would likely have assaulted staff if he had not been removed from his bunk on the night in question. None of the Defendants struck Plaintiff. Exhibit A, ¶¶ 3-4; Exhibit B, ¶¶ 3-6. Defendants Escherich and Watson attest that Plaintiff refused to come out of his bunk and resisted staff, requiring staff to use force. However, none of the staff members struck Plaintiff and the least amount of force necessary was used. Exhibit C, ¶¶ 3-15; Exhibit D. Finally, Defendants Brown and Eicher attest that they provided Plaintiff with necessary care, and at no time did they refuse care or cause Plaintiff injury. Exhibits E and F. Therefore, it is clear that an issue of fact exists in this case which prevents the issuance of summary judgment.

In summary, in the opinion of the undersigned, Plaintiff is not entitled to summary judgment. Accordingly, it is recommended that Plaintiff's Motion for Summary Judgment (Docket #163) be denied.

NOTICE TO PARTIES: Objections to this Report and Recommendation must be served on opposing parties and filed with the Clerk of the Court within fourteen (14) days of receipt

of this Report and Recommendation.  28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b); W.D. Mich. LCivR 72.3(b).  Failure to file timely objections constitutes a waiver of any further right to appeal. *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985).

       /s/ Timothy P. Greeley
      TIMOTHY P. GREELEY
      UNITED STATES MAGISTRATE JUDGE

Dated:   January 27, 2014